# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 16-1472V
### Filed: June 27, 2019
PUBLISHED

| | |
|---|---|
| ROBERT WALLACE<br><br>                Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH<br>AND HUMAN SERVICES,<br><br>                Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Joseph Alexander Vuckovich, Maglio Christopher & Toale, PA, Washington, DC, for petitioner.*
*Alexis B. Babcock, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On November 8, 2016, Robert Wallace ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that he suffered a left shoulder injury as a result of an influenza ("flu") vaccine he received on October 17, 2015. Petition at 1-2. The case was assigned to the Special Processing Unit of the Office of Special Masters. For the reasons discussed below, the undersigned now finds that petitioner is entitled to compensation in the amount of **$126,219.47.**

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this published decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.      Procedural History

Petitioner filed his petition for compensation on November 8, 2016.  On November 9, 2016, petitioner filed eight medical record exhibits and a Statement of Completion.  (ECF Nos. 5 - 6).  Subsequently, petitioner filed an affidavit, additional medical record exhibits and an amended Statement of Completion.  (ECF Nos. 9, 15 - 16).   On July 10, 2017, respondent filed his report pursuant to Vaccine Rule 4(c) conceding that petitioner was entitled to compensation for a Shoulder Injury Related to Vaccine Administration ("SIRVA").  (ECF No. 20).  On July 11, 2017, the undersigned issued a ruling finding petitioner entitled to compensation for SIRVA.  (ECF No. 22).  A damages order was issued on July 14, 2017.  (ECF No. 23).

On November 29, 2018, a status conference was held to discuss the parties' progress resolving damages in this case.  (ECF No. 53).  The parties' counsel reported at that conference that they were at an impasse in their informal discussions to resolve damages and would require a decision on damages from the undersigned.  *Id.*  A schedule for the filing of briefs and any additional evidence was agreed upon.  *Id.*  The parties have filed briefs discussing the damages issues in this case.  This case is now ripe for a determination regarding petitioner's pain and suffering, unreimbursed expenses, and award of damages.

## II.      Factual History

On October 17, 2015, Mr. Wallace (age 79) received a flu vaccine at CVS Pharmacy.  Petitioner's Exhibit ("Pet. Ex.") 1 at 2.   Petitioner's prior medical history does not appear to be contributory to his claim.

On December 1, 2015, petitioner was seen at the office of the Cleveland Clinic, his primary care provider, for a complaint of loss of range of motion.  Pet. Ex. 12 at 12.

Renee Smith, CNP, noted that:

Patient states that he received a flu shot from pharmacist at CVS on 10/17/15. On the way to his car, he felt a electric pain in left upper arm. He called the pharmacist and was told that the symptoms should resolve [in] a few days. He applied [a] heating pad. In the past week, he has been unable to sleep on his left side and unable to raise his left arm. [Patient complains of] intermittent localized dull achy pain from left shoulder to elbow that becomes sharp with arm elevation - pain rated a 6 out of 10 on the analogue scale. His left fingers become numb and tingling at times. He states that his left arm is weak.

Pet. Ex. 12 at 3.  On physical examination petitioner was found to have "left shoulder pain, painful movement, loss of ROM [range of motion] and injury" and referred to physical therapy.  *Id.* at 3-4.  Additionally, petitioner underwent an x-ray of his left shoulder that same date.  "No acute abnormality in the left shoulder" was found.  *Id.* at 10.

Petitioner began physical therapy on December 8, 2015 at the Cleveland Clinic and reported as follows:

since the [flu] shot [patient] has received severe limitation in shoulder movement and lateral upper arm soreness. [Patient] also notes numbness/tingling which "comes and goes" which radiates to fingers and forearm. [Patient] states that he never had any problem in the past regarding L[eft] shoulder pain. Prior to getting [the] shot [patient] was working outside and raking leaves, [patient] was unable to return to this task later that day after he had received [the] flu shot. [Patient] is concerned due to only mild improvement in [symptoms] over the last 2 months. [Patient] reports that he [has] not had a good night[] sleep since it happened. P[atient] is R[ight] hand dominant.

Pet. Ex. 5 at 3.  Petitioner reported a current pain level of 6/10 with arm movement and 0/10 at rest.[3]  *Id.*  On examination, petitioner was found to have moderate limitations of the left shoulder in abduction (135) and scaption (100) with pain.  *Id.* at 4.  A minimal limitation and pain was found with horizontal abduction of the left shoulder.  *Id.*  It was found that petitioner presented with a high disability (77%) of his shoulder pursuant to a Quick Dash evaluation.  *Id.* at 5-6.  Petitioner was recommended to engage in follow-up physical therapy appointments once to twice a week for one month.  *Id.* at 6.

Petitioner returned to his primary provider's office on December 16, 2015 with continuing symptoms of pain in the left shoulder since his October 17, 2015 flu vaccination.  Pet. Ex. 7 at 37.  Petitioner reported that he felt physical therapy was not helpful and he could not fully raise his arm.  *Id.*  Sathya Reddy, MD, assessed petitioner as having a shoulder impingement syndrome and referred him to orthopedics. *Id.* at 38.

However, on December 17, 2015, petitioner was seen by his physical therapist for his third visit and reported "that his shoulder is getting better everyday and he awakened without pain [that] morning for the first time."  Pet. Ex. 11 at 7.

On December 29, 2015, petitioner was evaluated by Christopher Philips, PA-C with the orthopedics department at the Cleveland Clinic for left shoulder pain.  Pet. Ex. 6 at 3.  Mr. Philips noted that petitioner had attended four structured physical therapy appointments and that his physical therapist reported improvements, however petitioner reported "therapy has not benefited me much."  *Id.*  Petitioner was assessed with pain in left shoulder, left shoulder tendonitis, and left arm numbness.  *Id.* at 6.  Mr. Philips noted as follows:

Patient has pain out of proportion to his exam findings. He does have some mild tenderness over the left deltoid bursa however no tenderness to palpation of the supraspinatus or infraspinatus tendons or the subacromial bursa. Impingement signs are negative. Patient is also having headaches and "tingling" radiating down the left upper extremity to the hand. This raises some concern for possible cervical radiculopathy which may be causing more of the symptoms.

*Id.*  Petitioner was started on prednisone.  *Id.*  A cervical x-ray was ordered, *id.*, which showed "mild disc space narrowing" of the lower cervical spine, but "no abnormal subluxation [was] seen on flexion or extension."  *Id.* at 12.

[3] A "Worst Pain Level" of 10/10 and a "Best Pain Level" of 0/10 were also indicated.   Pet. Ex. 5 at 3.

3

On December 31, 2015, petitioner was discharged from physical therapy reporting "that he is back at square one with the shoulder, citing that it is just as painful and it has ever been." Pet. Ex. 5 at 11. Petitioner further reported that his "sleeping remains significantly impacted due to shoulder pain." *Id.* However, petitioner did state that therapy helped and reported no current left shoulder pain, and pain with movement at 5/10.[4] *Id.* On examination petitioner was found to have a moderate limitation with elevation, his scaption was 155 (his right shoulder scaption was 160), and his Quick Dash remained high at 77%. *Id.* Petitioner was recommended to continue a home exercise program and follow-up with orthopedics. *Id.* at 13. On January 5, 2016, petitioner was seen again by Mr. Philips for an orthopedic evaluation, wherein he reported "some mild improvement with prednisone" but continued limited range of motion. Pet. Ex. 6 at 15. Mr. Philips assessed petitioner with pain and left shoulder tendonitis and referred him for an MRI of the left shoulder. *Id.* at 18.

An MRI examination was conducted on January 7, 2016 and Patricia Delzell, MD, noted the following impression: "moderate chronic subacromial subdeltoid bursitis; rotator cuff tendinosis without full-thickness tear, retraction or muscle atrophy; [and a] mildly complex labral tear, likely degenerative." *Id.* at 28 (text reformatted from original). On January 11, 2016, petitioner was seen again by Mr. Philips for an orthopedic evaluation following his MRI. *Id.* at 25. Mr. Philips assessed petitioner with bursitis of the left shoulder, acromioclavicular joint arthritis, left shoulder tendonitis, left shoulder impingement, and a degenerative tear of the glenoid labrum of his left shoulder. *Id.* at 29. Petitioner declined receipt of a subacromial injection on January 11, 2016, and was advised to continue his home exercise program, oral NSAIDs, rest, and ice. *Id.*

On April 5, 2016, petitioner was evaluated by orthopedic surgeon, Sanjay Palekar, MD. Pet. Ex. 8 at 1. Dr. Palekar found limitation of all movement, specifically finding rotation limited with arm by side, however he found no localized tenderness or swelling of the left shoulder. *Id.* Dr. Palekar prescribed Mobic, heat and massage twice daily, gravity assist exercises, and proper arm positioning. *Id.* Petitioner was seen again by Dr. Palekar on April 25, 2016, at which time his pain was noted to be improved, although weakness was described. *Id.* On May 19, 2016, petitioner reported that his pain had subsided, and he could sleep on his left shoulder. *Id.* However, it was noted that petitioner "[s]uddenly reached up for [a] curtain rod, and felt pain. Still has weakness." *Id.* His examination on May 19, 2016 demonstrated "full rotations with arm by the side." *Id.* At a subsequent evaluation on July 19, 2016, Dr. Palekar noted petitioner still "feels weakness of his left arm." *Id.* An examination demonstrated "full rotations terminal lack of extension with tightness on anterior." *Id.* It was noted that petitioner was "making gradual progress," but that there was "no timetable for recovery." *Id.*

On January 23, 2017, another MRI was taken of petitioner's left shoulder at the Cleveland Clinic. Pet. Ex. 10 at 3. Naveen Subhas, MD, recorded an impression of "no acute abnormality" and "mild rotator cuff tendinosis without tear, unchanged." *Id.* (text reformatted from original).

Petitioner presented to his primary care provider, Dr. Reddy, at the Cleveland Clinic on August 23, 2017 for a Medicare yearly exam. Dr. Reddy noted that petitioner complained of a rotator cuff tear, that an injection helped some, and that he "does

---

[4] A "Worst Pain" of 10/10 was indicated. Pet. Ex. 5 at 11.

exercises and uses warm compresses." Pet. Ext 15 at 3.   Petitioner's primary encounter diagnosis was abdominal aortic aneurysm without rupture. *Id.* He was noted to be an 81-year-old male with pulmonary emphysema. *Id.* Dr. Reddy also reported that petitioner

> feels sad and depressed about this, [5] [he has] always been an active person, feels depress[ed]. [He] is not able to do [the] things he used to do. This year [he] was unable to use [his] boat. [He] does not want medication to help with depression. [He is] willing to try [C]ymbalta.

*Id.* It was also noted that petitioner was a three pack a week smoker with no plans of quitting but was "trying to cut back." *Id.*

On September 19, 2017, petitioner was seen by orthopedist Andrew Matko, MD, at the Cleveland Clinic for an evaluation of his left upper extremity. Pet. Ex. 14 at 2. Petitioner reported a "constant ache in his left shoulder radiating down to his left wrist" for two years since his flu shot. *Id.* Petitioner reported to Dr. Matko that he was able raise his arm and use his shoulder without weakness, but due to a "constant ache down to his hand" he "cannot function as well." *Id.* Petitioner reported a cortisone injection "helped with some discomfort, but never got rid of the aching." *Id.* However, petitioner indicated that another cortisone injection "a couple weeks ago . . . did not provide him much relief." *Id.* Petitioner further described "numbness and tingling throughout his left hand" and indicated he does not have "grip strength" in his left hand. *Id.* On physical examination, Dr. Matko found that petitioner had "full range of motion of both shoulders," and no tenderness to palpitation of his left shoulder, upper arm, forearm, wrist, or hand. *Id.* at 3.  Dr. Matko examined petitioner's MRI and indicated that there was no evidence of any rotator cuff tearing" but "[t]here is very mild supraspinatus tendinosis noted" and "some questionable degenerative labral changes" as well as "[s]ome mild hypertrophic changes at the acromioclavicular joint with any significant impingement projection noted." *Id.* Dr. Matko indicated concern that petitioner's injury might be neurological in nature given petitioner's description of "symptoms with radiating pain up and down the arm and numbness in the hand." *Id.* He also suspected petitioner's injury could be a cervical radiculopathy. *Id.* Dr. Matko recommended petitioner receive an EMG, nerve conduction study and then follow-up with him. *Id.*

It does not appear that petitioner underwent the EMG, or followed-up further with Dr. Matko or Cleveland Clinic's orthopedics department.  Rather, petitioner sought treatment from the Cleveland Shoulder Institute, where he was evaluated on November 22, 2017, by Reuben Gobezie, MD.  Pet. Ex. 17 at 3.  It was noted that petitioner was "struggling with left shoulder pain" which started after his October 2015 influenza vaccination. *Id.* Dr. Gobezie noted that petitioner's "shoulder aches all the time and he has a sharp pain with certain motions." *Id.* Dr. Gobezie reported that petitioner "denies any numbness/tingling." *Id.* Dr. Gobezie assessed petitioner with bicipital tendinitis of the left shoulder and after reviewing surgical and conservative treatment options with petitioner noted that petitioner would like to proceed with surgery. *Id.* at 5. Petitioner was seen again by Dr. Gobezie on December 21, 2017 for a preoperative visit. *Id.* at 6. Thereafter, on December 28, 2017, petitioner underwent the following procedures on his left shoulder performed by Dr. Gobezie: open subpectoral biceps tenodesis, arthroscopic subacromial decompression with acromioplasty, arthroscopic extensive

---

[5] Dr. Reddy's record does not make clear the reason that petitioner felt sad and depressed.

debridement, and arthroscopic labral debridement.  *Id.* at 12.  Dr. Gobezie pre and postoperative diagnosis of petitioner's left shoulder were identical, as follows: biceps tendon tear, superior labral tear, and impingement.  *Id.* It was noted that the extensive debridement "took a considerable amount of time."  *Id.* at 13.

Petitioner was seen for a post-operative visit with Dr. Gobezie on January 3, 2018.  Dr. Gobezie noted that petitioner's "activity level is back to pre-operative" status and that petitioner was "doing well" and had "mild pain."  Pet. Ex. 17 at 15.  Petitioner was seen again by Dr. Gobezie on February 19, 2018.   At that time, Dr. Gobezie indicated that petitioner was "getting better every day," was not taking medication, and had "shoulder aches on occasions with movement."  *Id.* at 19.  It was noted that petitioner was doing physical therapy on his own.  *Id.*  Petitioner was advised to follow-up "prn" ("as needed").  *Id.* at 20.  No subsequent medical records have been filed.

On January 2, 2019, petitioner filed a status report indicating that he had filed all medical records and other evidence in regard to damages. (ECF No. 55).

## III.    Party Contentions

Petitioner seeks an award in the amount of $146,219.47, consisting of $140,000.00 as compensation for his actual pain and suffering, $5,000.00 for his projected pain and suffering, and $1,219.47 for past unreimbursable medical expenses.  Petitioner's Motion for Findings of Fact Regarding Damages ("Pet. Motion") at ¶¶ 5, 13-14 (ECF No. 56).[6]

In support of his claim for damages, petitioner compares the facts in his case to those in three other decisions, *Knudson, Dobbins, and Collado*[7] in which amounts from $110,000.00 to $125,000.00 were awarded by the undersigned.  Pet. Motion ¶¶ 16-21.  Petitioner points to some similarities between his case and these cases, but draws other distinctions to argue the pain and suffering in the instant case appears greater.  *Id*.

Respondent argues that petitioner should be awarded $107,000.00 as compensation for his actual pain and suffering.  Respondent's Response to Petitioner's Motion for Finding of Fact Regarding Damages ("Resp. Response") at 1 (ECF No. 57).  Respondent argues that petitioner's medical records document "that his clinical course did not necessitate[ ] immediate or consistent ongoing treatment. Nor does he have ongoing pain that would necessitate an award on the higher end of the statutory range."  *Id*. at 13.   Comparing petitioner's facts to those in the undersigned's decisions in

---

[6] Petitioner requests a Finding of Fact Regarding Damages and requests the undersigned to make factual findings as to petitioner's damages pursuant to Vaccine Rule 8.  However, the undersigned notes that the appropriate ripe ruling in this case is a Decision on Damages.

[7] *Knudson v. Sec'y Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Collado v. Sec'y Health & Human Servs.*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses); *Dobbins v. Sec'y Health & Human Servs.*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses);

*Desrosier, Dhanoa, Marino*, *Young, and Knudson*[8] respondent asserts [u]nder the totality of the circumstances, an award of no more than $107,000.00 for pain and suffering for petitioner's []SIRVA is just and fair compensation." *Id.* at 15.  Additionally, "[r]espondent does not dispute petitioner's claim for past unreimbursed expenses is well-supported and related to his right SIRVA." *Id.*

## IV.    Discussion and Analysis

Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).  Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. Sec'y Health & Human Servs.*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).  Medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on their daily life.  *Shapiro v. Sec'y Health & Human Servs.*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.").

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  *See I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125 at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), *originally issued* Apr. 19, 2013 ("*I.D.*") ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594 at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering.  *See I.D.*, 2013 WL 2448125 at *9-11(citing *McAllister v. Sec'y of Health & Human Servs.*, No. 91-1037V, 1993 WL 777030 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).  In evaluating these factors, the undersigned has reviewed the entire record, including medical records and affidavits submitted by petitioner and others.

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering this case.

---

[8] *Desrosiers v. Sec'y Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); *Dhanoa v. Sec'y Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Marino v. Sec'y Health & Human Servs.*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Young v. Sec'y Health & Human Servs.*, No. 15-1241V, 2019 WL 664495 (Fed. Cl. Spec. Mstr. Jan. 22, 2019) (awarding $100,000.00 for past pain and suffering and $2,293.15 for past unreimbursable expenses); *Knudson v. Sec'y Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses).

Case 1:16-vv-01472-UNJ   Document 64   Filed 09/17/19   Page 8 of 17

*See, e.g., Jane Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, the undersigned also may rely on her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, it must be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, the Court rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the $250,000.00 statutory cap. The Court noted that this constituted "forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, the Court assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595.

## A. History of SIRVA Settlement and Proffer

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2019, 1,023 SIRVA cases have informally resolved[9] within the Special Processing Unit since its inception in July of 2014. Of those cases, 602 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[10] Additionally, 395 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $77,000.00 to $125,000.00.[11] The median award is $100,000.00. In most instances, these awards are presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering.

---

[9] Additionally, 31 claims alleging SIRVA have been dismissed within the SPU.

[10] Additionally, there have been 16 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[11] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00. Among the 16 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $122,886.42. For these awards, the second and third quartiles range from $90,000.00 to $160,502.39.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $95,000.00.[12]  The median award is $70,000.00.  As with proffered cases, in most instances, stipulated awards are presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering.  Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

## B.  Prior Decisions Addressing SIRVA Damages

In addition to the extensive history of informal resolution, the undersigned has also issued 14 reasoned decisions as of the end of March of 2019 addressing the appropriate amount of compensation in prior SIRVA cases within the SPU.[13]

### i.    Below-median awards limited to past pain and suffering

In six prior SPU cases, the undersigned has awarded compensation for pain and suffering limited to compensation for actual or past pain and suffering that has fallen below the amount of the median proffer discussed above.  These awards ranged from $60,000.00 to $85,000.00.[14]  These cases have all included injuries with a "good" prognosis, albeit in some instances with some residual pain.  All of these cases had only mild to moderate limitations in range of motion and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis or edema.

---

[12] Typical range refers to cases within the second and third quartiles.  Additional outlier awards also exist.  The full range of awards spans from $5,000.00 to $509,552.31.  Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

[13] An additional case, *Young v. Sec'y Health & Human Servs.*, No. 15-1241V, was removed from the SPU due to the protracted nature of the damages phase of that case.  In that case the undersigned awarded $100,000.00 in compensation for past pain and suffering and $2,293.15 for past unreimbursable expenses.  2019 WL 664495 (Fed. Cl. Spec. Mstr. Jan. 22, 2019).  A separate reasoned ruling addressed the amount awarded.  *Young v. Sec'y Health & Human Servs.*, No. 15-1241V, 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019).

[14] These cases are:  *Knauss v. Sec'y Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Marino v. Sec'y Health & Human Servs.*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Attig v. Sec'y Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); *Kim v. Sec'y Health & Human Servs.*, No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Desrosiers v. Sec'y Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); *Dirksen v. Sec'y Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses).

The duration of injury ranged from seven to 21 months and, on average, these petitioners saw between 11 and 12 months of pain.

Significant pain was reported in these cases for up to eight months. However, in most cases, these petitioners subjectively rated their pain as six or below on a ten-point scale. Only the petitioners in *Kim* and *Attig* reported pain at the upper end of the ten-point scale. Most of these petitioners pursued physical therapy for two months or less and none had any surgery. Only two (*Attig* and *Marino*) had cortisone injections. Several of these cases (*Knauss*, *Marino*, *Kim*, and *Dirksen*) delayed in seeking treatment. These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

Two of the petitioners (*Marino* and *Desrosiers*) had significant lifestyle factors that contributed to their awards. In *Marino*, petitioner presented evidence that her SIRVA prevented her from her avid tennis hobby. In *Desrosiers*, petitioner presented evidence that her pregnancy and childbirth prevented her from immediately seeking full treatment of her injury.

### ii.    Above-median awards limited to past pain and suffering

Additionally, in five prior SPU cases, the undersigned has awarded compensation limited to past pain and suffering falling above the median proffered SIRVA award. These awards have ranged from $110,000.00 to $160,000.00.[15] Like those in the preceding group, the prognosis was "good." However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or by the need for surgical repair. Four out of five underwent some form of shoulder surgery while the fifth (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment. On the whole, MRI imaging in these cases also showed more significant findings. In four out of five cases, MRI imaging showed possible evidence of partial tearing.[16] No MRI study was performed in the *Cooper* case.

---

[15] These cases are: *Cooper v. Sec'y Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Knudson v. Sec'y Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Collado v. Sec'y Health & Human Servs.*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses); *Dobbins v. Sec'y Health & Human Servs.*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222953 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses).

[16] In *Reed*, MRI showed edema in the infraspinatus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head. In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glen humeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies. In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus. In *Knudson*, MRI showed mild

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion.  Moreover, these petitioners tended to seek treatment of their injuries more immediately.  Time to first treatment ranged from five days to 43 days.  Duration of physical therapy ranged from one to 24 months and three out of the five had cortisone injections.

### iii.   Awards including compensation for both past and future pain and suffering

In three prior SPU SIRVA cases, the undersigned has awarded compensation for both past and future pain and suffering.[17]  In two of those cases (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain.  The *Hooper* petitioner underwent surgery while in *Binette,* petitioner was deemed not a candidate for surgery following an arthrogram.  Despite significant physical therapy (and surgery in *Hooper*), medical opinion indicated that their disability would be permanent.  In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies.  In the third case (*Dhanoa*), petitioner's injury was less severe than in *Hooper* or *Binette*; however, petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis.  The undersigned awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded one-year of projected pain and suffering.

### C. Determining Petitioner's Award of Pain and Suffering in This Case

In the experience of the undersigned, awareness of suffering is not typically a disputed issue in cases involving SIRVA.  In this case, neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering and the undersigned finds that this matter is not in dispute.  Thus, based on the circumstances of this case, the undersigned determines that petitioner had full awareness of his suffering.

---

longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

[17] These cases are: *Dhanoa v. Sec'y Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y Health & Human Servs.*, No. 16-731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); and *Hooper v. Sec'y Health & Human Servs.*, No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

### a. Severity and Duration of the Injury

### i. Affidavit Testimony

With respect to the severity of petitioner's injury, petitioner's affidavit testimony[18] regarding pain and suffering provides a description of pain suffered for over two years from his vaccination on October 17, 2015 until after his surgery on December 28, 2017. Pet. Ex. 19 ¶¶ 6-21. Petitioner averred that for over two years he suffered "severe chronic pain and physical disability." *Id*. at ¶13. Petitioner stated that his shoulder pain woke him up several times a night and that during this time period he was unable to sleep more than three to four hours a night. *Id*. Petitioner states that in order to fall asleep it was necessary for him to take 1000mg of acetaminophen nightly, and that for this period of more than two years he was chronically fatigued. *Id*. Petitioner testified that due to his extreme pain he could no longer enjoy his pre-vaccination activities of riding his bike, piloting his boat, and landscaping and caring for his home and property. *Id*. at ¶14. Petitioner stated because he could barely move one arm he had to rely upon his wife for daily tasks, such as dressing, caring for their pets, and preparing food. *Id*. at ¶16. The loss of his independence petitioner stated caused him to feel sad and frustrated as he took pride in his independence. *Id*. Petitioner testified that his inability to enjoy his hobbies, and abrupt change from an active to a "sedentary life of chronic pain was very difficult emotionally." *Id*. at ¶15. Petitioner states he experienced periods of depression as a result, and experienced changes in his disposition which caused a strain in his marriage, family relationships, and friendships. *Id*. at ¶15. Petitioner states because of his age at the time of his vaccination and injury, 79, his sleep deprivation and pain and the loss of activities he enjoyed was more severe than it may otherwise have been, asserting "activity and plenty sleep are essential for good mental and physical health as a person ages." *Id*. at ¶17.

Petitioner testified that it was his impression from his doctors that he was not a good candidate for surgery, and he concluded that his injury was permanent, and that he had "nothing to look forward to except pain, fatigue, and boredom." *Id*. at ¶19. Petitioner stated this was particularly distressing given the fulfilling retirement he had worked for of landscaping, boating, biking, and sharing these activities with is family, making him more depressed. *Id.*

At the recommendation of a friend, petitioner consulted with Dr. Gobezie of the Cleveland Shoulder Institute for a second opinion regarding surgery. This appointment was on November 22, 2017. Dr. Gobezie, petitioner testified, recommended surgery which was performed on December 28, 2017. *Id*. at ¶20. Petitioner testified that subsequent to his surgery Dr. Gobezie recommended a lengthy period of rest and home physical therapy which petitioner followed, and that by the "summer of 2018" petitioner testified his "shoulder had improved markedly. At this point I would say that I have almost completely regained my prior level of functioning, although I continue to experience occasional aches and pain in this shoulder." *Id*. at ¶21.

---

[18] Petitioner's affidavit regarding pain and suffering was sworn to and subscribed before a Notary Public on January 2, 2019. Pet. Ex. 19 at 5.

## ii.  Medical Record Evidence

Petitioner first sought treatment approximately 45 days after his vaccination.
Pet. Ex. 12 at 2.  At that time, he reported pain rated 6/10, an inability to sleep on his left
side, and an inability to raise his left arm.  Pet. Ex. 12 at 3.  Petitioner demonstrated loss
or range of motion and pain in his left shoulder on physical exam.  Pet. Ex. 12 at 3-4.
Petitioner was referred to physical therapy and completed five sessions between
December 8 and December 31, 2015.  Petitioner also followed up with his primary care
provider on December 16, 2015, and orthopedics on December 29, 2015.  Pet. Ex. 7 at
37; Pet. Ex. 6 at 3.   Petitioner's reports to his providers throughout this month varied in
regard to the severity of his symptoms.  On December 8, 2015 at his first physical
therapy visit, petitioner reported pain level of 6/10 with arm movement and was found to
have moderate limitations of the left shoulder in abduction and scaption.  Pet. Ex. 5 at 3-
4.  He also reported he had not had a good night's sleep since his injury. *Id*. at 3.
Additionally, petitioner presented with a high disability score of his left shoulder of 77%.
*Id*. at 5-6.  On December 16, 2015, he reported to his primary provider that he did not
think physical therapy was helping and was referred to orthopedics.  Pet. Ex. 7 at 37-
38.  However, one day later, at a physical therapy visit petitioner reported his shoulder
was improving every day and he awakened without pain that morning for the first time.
Pet. Ex. 11 at 7.  On discharge from physical therapy on December 31, 2017,
petitioner's disability score remained high at 77%, petitioner reported his sleeping
remained significantly impacted due to his shoulder pain, and that in addition to the pain
another frustrating factor was his fatigue.  Pet. Ex. 5 at 11.  On examination he was
found to have a moderate limitation with elevation movement.  *Id.*  Petitioner reported
no current left shoulder pain, and a pain with movement at 5/10.  *Id.*  Petitioner's
therapist noted that while at one point during therapy he seemed to be improving,
reporting improved pain and demonstrating increased range of motion. *Id.* at 13.
However, on discharge petitioner's symptoms seemed to have returned to frequency
and intensity levels similar to when he began therapy.  *Id.*

Petitioner was noted to have mild improvement with the use of prednisone by
orthopedics on January 5, 2016, however he continued to have limited range of motion
and was referred for an MRI.  Pet. Ex. 6 at 15, 18.  Petitioner's January 7, 2016 left
shoulder MRI report demonstrated: "moderate chronic subacromial subdeltoid bursitis;
rotator cuff tendinosis without full-thickness tear, retraction or muscle atrophy; [and a]
mildly complex labral tear, likely degenerative."  *Id.* at 28 (text reformatted from original).
On January 11, 2016, petitioner was seen by orthopedics in follow-up to his MRI and
assessed with bursitis of the left shoulder, acromioclavicular joint arthritis, left shoulder
tendinitis, left shoulder impingement, and a degenerative tear of the glenoid labrum of
his left shoulder.  *Id.* at 29.   Petitioner declined a subacromial injection on this date, and
was advised to continue his home exercise program, oral NSAIDs, rest, and ice.  *Id.* at
29.

Thereafter, petitioner treated at a different orthopedic office, with Sanjay Palekar,
MD, from April 5, 2016 through July 19, 2016.  Pet. Ex. 8 at 1. By July 19, 2016, Dr.
Palekar noted petitioner still "feels weakness of his left arm."  *Id.*  An examination
demonstrated "full rotations terminal lack of extension with tightness on anterior."  *Id.*  It

was noted that petitioner was "making gradual progress," but that there was "no timetable for recovery." *Id.*

On January 23, 2017, another MRI was taken of petitioner's left shoulder an impression of "no acute abnormality" and "mild rotator cuff tendinosis without tear, unchanged" was recorded.  Pet. Ex. 10 at 3 (text reformatted from original).

Petitioner complained to his primary care provider, Dr. Reddy, on August 23, 2017, of a rotator cuff tear, noted that an injection helped some, and indicated that he does exercises and uses warm compresses.  Pet. Ext 15 at 3.  Dr. Reddy reported in his records that petitioner was feeling sad and depressed.  Although the specific reasons for the feelings is not made clear, Dr. Reddy does note that petitioner shared he "[has] always been an active person, feels depress[ed]. [He is] not able to do [the] things he used to do.  This year [he]was unable to use [his] boat. [He] does not want medication to help with depression. [He] is willing to try [C]ymbalta." *Id.*

Petitioner returned to the Cleveland Clinic's orthopedic department and was seen by orthopedist Andrew Matko, MD on September 19, 2017. Pet. Ex. 14 at 2.  Petitioner reported a "constant ache in his left shoulder radiating down to his left wrist" for two years since his flu shot.  *Id.*  Specifically, he reported he was unable raise his arm and use his shoulder without weakness, due to a "constant ache down to his hand" he "cannot function as well." *Id.*  Petitioner reported a cortisone injection "helped with some discomfort, but never got rid of the aching."  *Id.*  It was also noted that another cortisone injection a few weeks prior "did not provide him much relief."  *Id.*  Petitioner further described "numbness and tingling throughout his left hand" and indicated he does not have "grip strength" in his left hand.  *Id.*  However, on physical examination Dr. Matko found that petitioner had "full range of motion of both shoulders," and no tenderness to palpitation of his left shoulder, upper arm, forearm, wrist, or hand.  *Id.* at 3.  Dr. Matko examined petitioner's MRI and indicated that there was no evidence of any rotator cuff tearing" but "[t]here is very mild supraspinatus tendinosis noted" and "some questionable degenerative labral changes" as well as "[s]ome mild hypertrophic changes at the acromioclavicular joint with any significant impingement projection noted." *Id.*  Dr. Matko indicated concern that petitioner's injury might be neurological in nature, recommending petitioner receive an EMG.  *Id.*

Instead, petitioner sought treatment from Reuben Gobezie, MD, at the Cleveland Shoulder Institute on November 22, 2017.  Pet. Ex. 17 at 3. Dr. Gobezie noted that petitioner's "shoulder aches all the time and he has a sharp pain with certain motions." *Id.*  Dr. Gobezie also reported that petitioner "denies any numbness/tingling." *Id.*  After reviewing surgical and conservative treatment options with petitioner Dr. Gobezie noted that petitioner would like to proceed with surgery.  *Id.* at 5.   On December 28, 2017 petitioner underwent the following procedures on his left shoulder performed by Dr. Gobezie: open subpectoral biceps tenodesis, arthroscopic subacromial decompression with acromioplasty, arthroscopic extensive debridement, and arthroscopic labral debridement.  *Id.* at 12.  Dr. Gobezie pre and postoperative diagnosis of petitioner's left shoulder were identical, as follows: biceps tendon tear, superior labral tear, and impingement.  *Id.* It was noted that the extensive debridement "took a considerable amount of time."  *Id.* at 13.

The most recent records filed by petitioner are from a February 19, 2018 post-surgical evaluation by Dr. Gobezie.   Dr. Gobezie indicated that petitioner was "getting

better every day," was not taking medication, and had "shoulder aches on occasions with movement." *Id.* at 19.  Petitioner was reported to be doing physical therapy on his own and advised to follow-up as needed.  *Id.* at 20.

There are no further documented symptoms or treatment for petitioner's shoulder in the medical records after this date.

### b.  Pain and Suffering

In total, petitioner experienced approximately 28 months of documented moderate level pain and suffering from his October 17, 2015 vaccination through his February 19, 2018 post-surgical visit with Dr. Gobezie.  Petitioner's reported pain levels throughout his physical therapy were 6/10 and was 5/10 upon discharge.

The course of petitioner's condition as described above is somewhat unique in that he experienced pain and suffering relatively consistently for over 26 months, although his symptoms seemed to wax and wane, until he improved substantially post-surgery.  The undersigned recognizes and finds that petitioner suffered significant sleep deprivation and resulting fatigue because of his injury.  Additionally, he became depressed at times due to his loss of independence, and the inability to enjoy the activities and hobbies in which he took pleasure.  Finally, petitioner underwent significant operative procedures 26 months after his initial injury only after which did he find substantial relief.

The *Desrosiers*, *Marino*, *Dhanoa, and Young* cases, cited by respondent did not involve surgery and are not comparable to petitioner's course of injury.  Petitioner not only experienced a significantly longer period of injury, but his two cortisone injections, surgical procedures and findings were indicative of a more severe injury.  The undersigned finds the pain and suffering experienced by petitioner more comparable to that in the *Collado* and *Dobbins* cases.  The undersigned agrees with petitioner that his surgical procedures were roughly comparable to those in *Collado* and *Dobbins*.  *See* Pet. Motion at ¶¶19, 21.  While the petitioners in *Collado* and *Dobbins* did not experience a total injury time as long as petitioner, the severity level of pain experienced by petitioners in those two cases prior to surgery appears higher than that experienced by petitioner.

In light of all of the above, and based on the record as a whole, the undersigned finds that $125,000.00 in compensation for past pain and suffering is reasonable and appropriate in this case.

### D.  Award for Future Pain and Suffering

With respect to petitioner's request for future pain and suffering, the undersigned finds that petitioner has not met his burden to demonstrate that such an award is warranted.  Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722 at *22-23 (Fed. Cl. Spec. Mstr. Mar, 18, 1996).  Contemporaneous medical records generally provide the most reliable supporting documentation of a

medical condition and the effect it has on an individual's daily life.  *See Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections"), *citing United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948); *see also Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528-29 (Fed. Cir. 1993) (noting that medical records are generally contemporaneous to the medical events recorded and are generally trustworthy records).

In this case, the record shows that petitioner obtained significant relief from surgery.  His last filed medical record documenting his February 19, 2018 post surgical evaluation by Dr. Gobezie indicates he was "getting better every day," was not taking medication, and had "shoulder aches on occasions with movement."  Pet. Ex. 17 at 19.

There are no further documented symptoms or treatment for petitioner's shoulder in the medical records after this date.  Petitioner notes in his affidavit that by the summer of 2018 his "shoulder had improved markedly . . .  [a]t this point I would say that I have almost completely regained my prior level of functioning, although I continue to experience occasional aches and pain in this shoulder."  Pet. Ex. 19 at ¶21.

The undersigned finds that petitioner has not met his burden of establishing by preponderant evidence that he is entitled to an award for future pain and suffering.

### E.  Award for Past Unreimbursed Expenses

Petitioner requests $1,219.47 in past unreimbursable expenses for which he provides supporting documentation and is awarded the full amount requested.  Pet. Ex. 18.

### F.  Amount of the Award

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  For all the reasons discussed above, the undersigned finds that $125,000.00 represents a fair and appropriate amount of compensation for petitioner's past pain and suffering.  In addition, the undersigned finds that petitioner is entitled to compensation for $1,219.47 for his past unreimbursed medical expenses.  No award is made for lost wages.

## V.  Conclusion

In light of all of the above, the undersigned awards **petitioner a lump sum payment of <u>$126,219.47,</u>** (representing $125,000.00 for petitioner's past pain and suffering and $1,219.47 for unreimbursable medical expenses) **in the form of a check payable to petitioner, <u>Robert Wallace</u>.**  This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).  *Id*.

The clerk of the court is directed to enter judgment in accordance with this decision.[19]

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Chief Special Master

---

[19] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.